WALTER A. GULESERIAN & another, trustees, vs. IRWIN
FIELDS & others.[1]

Middlesex. June 2, 1966. — June 27, 1966.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, SPIEGEL, & REARDON, JJ.

*Mortgage,* Of real estate: extension, junior mortgage.

An agreement between a first mortgagee of real estate and the mortgagor,
providing only that payment of certain monthly instalments of princi-
pal called for by the mortgage note should be postponed until the
maturity of the note, would not affect in any way the priority of the
first mortgagee's security interest as against a second mortgagee of the
property even though the second mortgage was given before the making
of such agreement and the second mortgagee did not assent thereto; nor
would nonpayment of the postponed instalments at the times originally
specified in the note constitute a default under the first mortgage or a
breach of the second mortgage affording basis for foreclosure of the
second mortgage; SPIEGEL, J., concurring.

BILL IN EQUITY filed in the Superior Court on January 24,
1964, for declaratory relief.

The suit was reported by *Thompson, J.,* without decision.

The case was submitted on briefs.

*Samuel Hoar, Jr., & Harold I. Pratt, Jr.,* for the plain-
tiffs & another.

*David Burstein* for the defendants Fields.

*Lawrence A. Sullivan & Henry P. Monaghan,* for Savings
Bank Association of Massachusetts, amicus curiae; *Fred-
erick D. Bonner,* for Massachusetts Co-operative Bank
League, amicus curiae.

*Richard Wait,* for Massachusetts Conveyancers Associa-
tion & another, amici curiae.

---

[1] Irwin Fields, Leo A. Fields, and Bertram Fields are general partners of
Commander Operating Company, a limited partnership. The case was first
before us in January, 1965. Charlestown Savings Bank was added as a party
defendant by direction of this court. On March 4, 1965, we remanded the
case to the Superior Court for that purpose, for expansion of the record, and
to permit the filing of briefs as amici curiae by the Savings Bank Association
of Massachusetts, Massachusetts Co-operative Bank League, Massachusetts
Conveyancers Association, The Abstract Club, and any other interested organi-
zations. The named organizations have filed very helpful briefs.

CUTTER, J.   The plaintiffs (the mortgagors) are the trustees of a Massachusetts real estate trust which owns, subject to the mortgages hereinafter mentioned, land and buildings (the locus) on Garden Street, Cambridge.   On September 15, 1960, the mortgagors gave a duly recorded first mortgage covering the locus to Charlestown Savings Bank (the bank) to secure the payment of $750,000 "in fifteen years, with interest thereon, or on any unpaid balance thereof, and on any sums hereafter advanced by the [h]older which lawfully accrue to the mortgage debt, as provided in our . . . note of even date."   The note provided that the mortgagors would pay monthly instalments of $6,249.99, consisting of principal and interest at the rate of six per cent per annum.[2]

On August 1, 1962, the mortgagors gave a second mortgage in statutory form covering the locus to Commander Operating Company (Operating) to secure the payment of $400,000 in twenty years, "as provided in a . . . note of Commander Properties, Inc. . . . of even date" with the second mortgage.   The note secured by the second mortgage provided for monthly payments of $1,666.67, on account of principal only, with interest "payable only on any past due installment . . . at the rate of seven per cent . . . per annum."

The mortgagors have sought the consent of Operating, as second mortgagee, to a proposed agreement between the

---

[2] The first mortgage authorized the holder of the mortgage to pay taxes and certain other charges and to add the amount so paid to the mortgage debt. The mortgagors, in addition to the statutory mortgage covenants, made various special covenants including one "(7) to remain liable upon the covenants herein and upon the note secured hereby notwithstanding any forbearance, extension or other indulgence given by the [h]older to any future owner of the mortgaged premises or other person, notice of any such forbearance, extension or other indulgence being hereby expressly waived."   The mortgage note itself contained a related provision, "All parties . . . personally liable for . . . any . . . indebtedness hereby evidenced agree, by executing or endorsing this note or by entering into . . . any agreement to pay any [such] indebtedness . . . that the . . . holder hereof shall have the right, without notice, to deal in any way at any time with any party or to grant to any party any extensions of time for payment of any of said indebtedness or any other indulgences or forbearances whatsoever without in any way affecting the personal liability of any party hereunder."   The first mortgage was upon the statutory condition and contained the statutory power of sale. See G. L. c. 183, §§ 18–21.

mortgagors and the bank (as first mortgagee) "to extend the terms of payments of principal under . . . [the first mortgage] note in the following manner: The . . . [first] mortgage note provides for the payment of monthly installments of . . . $6,249.99 . . . to be applied first to interest due under . . . [the] note and the balance to principal. The proposed extension agreement . . . would postpone the principal payments included in the twenty-four . . . installments next following . . . the execution of such agreement until October 15, 1975, the stated maturity date of the . . . [first] mortgage note, all of . . . [the] postponed principal payments becoming due in a lump sum on . . . [that] date. Interest at the rate of six per centum . . . per annum, as specified in the note, would continue to be paid monthly on the outstanding principal balance, which by reason of the foregoing arrangement would remain constant during . . . [such] period of twenty-four . . . months."

Operating has refused to consent to this arrangement and has notified the mortgagors that if such an agreement is made with the bank Operating "will demand that . . . [the mortgagors] continue to pay monthly installments according to the present tenor of the first mortgage note, and [will take the position] that failure to make such payments would constitute a default under the terms of the second mortgage." Operating also contends that any such extension agreement will not be binding on it, will constitute a violation of its rights as holder of the second mortgage, and will affect the priorities as between the holders of the first and second mortgages.

The mortgagors by their bill seek a declaration (G. L. c. 231A) "that any lawful extension of the terms of payment of the first mortgage note, made without . . . [Operating's] consent . . . does not constitute a breach by the . . . [mortgagors] of the conditions of the second mortgage." The parties, since the earlier remand of this case (fn. 1), have agreed upon a revised case stated. The case for a second time has been reported without decision for

the determination of this court by a judge of the Superior
Court.

1. The crucial language of each of the mortgages is that
of the statutory mortgage condition found in G. L. c. 183,
§ 20, set out in the margin,[3] so far as relevant. The ques-
tions for decision are (a) whether by reason of the pro-
posed extension agreement, the bank, as first mortgagee,
will lose in any degree the priority of its security interest
in the locus with respect to any part of the secured in-
debtedness and the interest thereon, and (b) whether the
extension agreement, if carried out, will constitute a breach
of the second mortgage, entitling Operating, as second mort-
gagee, to foreclose.

It is important to bear in mind precisely what form of ex-
tension is now proposed. There would be no increase in
the interest rate payable upon the balance of principal from
time to time due upon the first mortgage note. That rate
is now fixed at six per cent per annum and is to remain at
six per cent. The only change proposed in the terms of the
mortgage note is that the monthly payments of principal
coming due within the period of twenty-four months follow-
ing the execution of the extension agreement will be post-
poned to the maturity date of the first mortgage. There
will be no increase, by reason of the extension agreement,
in the principal amount due upon the first mortgage at the
date of the execution of the extension agreement. Thus the
only adverse effects, so far as the second mortgagee is con-
cerned, of the extension agreement will be that the first

---

[3] Section 20 provides that a condition may be incorporated by reference in
any mortgage, as follows: "Provided, nevertheless, except as otherwise spe-
cifically stated in the mortgage, that if the mortgagor, or his heirs . . . [or
personal representatives] shall pay unto the mortgagee or his . . . [personal
representatives] the principal and interest secured by the mortgage, and
[A] shall perform any obligation secured at the time provided in the note,
mortgage or other instrument [B] or any extension thereof, and [C] shall
perform the condition of any prior mortgage, and until such payment and
performance shall pay when due and payable all taxes, charges and assess-
ments . . . shall keep the buildings on said premises insured against fire . . .
[in a manner more fully set out in the statutory condition], and shall not
commit or suffer any strip or waste of the mortgaged premises or [D] any
breach of any covenant contained in the mortgage or in any prior mortgage,
then the mortgage deed, as also the mortgage note or notes, shall be void."
The letters in brackets have been inserted for convenient reference to the lan-
guage immediately following such letters, respectively.

mortgage debt will not be reduced as rapidly as the parties to the first mortgage and note originally had agreed that it would be (obviously, primarily at least, for the benefit of the first mortgagee), and interest will be paid upon the amount of the postponed principal payments for a longer period than was originally contemplated.

2.  The mortgagors and the bank, as between themselves, may extend the time for payment of the first mortgage indebtedness, or any part thereof, by agreement binding on them as parties to the extension.  See G. L. c. 183, appendix, form (7); *Depon* v. *Shawye,* 263 Mass. 206, 210; *Norfolk County Trust Co.* v. *Green,* 304 Mass. 406, 407–408; Tiffany, Real Property (3d ed.) § 1487; Jones, Mortgages (8th ed.) §§ 438, 1186–1187, 1202; Glenn, Mortgages, § 50.4; Swaim, Crocker's Notes on Common Forms, (7th ed.) §§ 446, 577–578.  The general rule is that a renewal or extension of an existing senior mortgage and the note (or other obligation) secured thereby, without an increase of the principal or interest payable with respect to the secured indebtedness, will not result in any loss of priority of that senior mortgage over junior encumbrances.[4]  The holder of the junior encumbrance is treated as taking his interest ''subject to a possible extension of the time of payment'' of the debt secured by a senior encumbrance.  See *Consolidated Natl. Bank* v. *Van Slyke,* 27 Ariz. 501, 506–508.  The holder of the junior encumbrance is regarded as necessarily taking the risk of a postponement (frequently an advantage to a second mortgagee) of the date of payment of the whole or part of the senior mortgage debt.  See *Commonwealth Life Ins. Co.* v. *Louisville Ry.* 234 Ky. 802, 806, 809–810.  The rule has been referred to as the ''universal

---

[4] The leading cases are collected in an annotation, 98 A. L. R. 843.  See, in addition to cases in the body of this opinion, *Higman* v. *Humes,* 127 Ala. 404, 410; *Crutchfield* v. *Johnson & Latimer,* 243 Ala. 73, 75; *Lomas & Nettleton Co.* v. *Isacs,* 101 Conn. 614, 622; *Miami Real Estate Co.* v. *Baxter,* 98 Fla. 900, 906–907; *Roberts* v. *Doan,* 180 Ill. 187, 189–190; *State Life Ins. Co.* v. *Freeman,* 308 Ill. App. 127, 142–143; *Fidelity & Columbia Trust Co.* v. *Louisville Ry.* 258 Ky. 817, 819–821; *Schwartz* v. *Smith,* 143 App. Div. (N. Y.) 297, 300–301, affd. 207 N. Y. 714; *Rice* v. *Federal Life Ins. Co.* 172 Okla. 358, 359; *Title & Trust Co.* v. *Nelson,* 157 Ore. 585, 595–596; *Hess* v. *State Bank of Goldendale,* 130 Wash. 147, 153; *Farmers & Merchants State Bank* v. *Hildebrandt,* 221 Wis. 394, 398.

rule." *Beckman* v. *Altoona Trust Co.* 332 Pa. 545, 550.[5]

A brief filed by amici curiae places emphasis upon G. L. c. 168, § 36, par. 4 (authorizing savings banks to make certain changes in the amount of periodic payments under mortgages); see amendment by St. 1962, c. 50, § 6. The existence of this provision has the effect of drawing the attention of junior lienholders to the possibility[6] that the holder of a savings bank mortgage may wish to extend the debt secured by a mortgage of which the savings bank is a holder. The statute, of course, confirms the authority of the bank, within its statutory powers, to make an extension like that now proposed. Apart from the statute, however, the authorities, already cited, show that an extension of the time for payment may be made by a holder of a mortgage without the consent of the holders of junior encumbrances and without loss of priority. See also G. L. c. 170, § 24, par. 8 (as amended through St. 1961, c. 333, § 8); c. 183, § 28A (as amended through St. 1956, c. 92).[7]

---

[5] See, in addition to the cases listed in fn. 4, *Barbano* v. *Central-Hudson Steamboat Co.* 47 F. 2d 160, 162–163 (2d Cir.); *Merchants & Marine Bank* v. *The T. E. Welles,* 289 F. 2d 188, 194 (5th Cir.) *Barnouw* v. *S.S. Ozark,* 304 F. 2d 717, 722 (5th Cir.), cert. den. 371 U. S. 923; *Re Central Conn. Screw Mach. Co.* 168 F. Supp. 718, 720 (D. Conn.); *Consolidated Natl. Bank of Tucson* v. *Van Slyke,* 27 Ariz. 501, 506–508; cases collected in annotation, 150 A. L. R. 331, 333–342; Meislin, Extension Agreements and the Rights of Junior Mortgagees, 42 Va. L. Rev. 939. See also *North Easton Co-op. Bank* v. *MacLean,* 300 Mass. 285, 288–289, 292–294; *Piea Realty Co. Inc.* v. *Papuzynski,* 342 Mass. 240, 244, 249 (but cf. *Houle* v. *Vallieres,* 281 Mass. 123, 124–125). Cf. *Bunker* v. *Barron,* 93 Maine, 87, 92–93 (apparently an effort to increase amount of prior encumbrance to the detriment of a subsequent encumbrance); *Pettis* v. *Darling,* 57 Vt. 647, 650–651 (increase in interest rate). Cf. also *Brockton Sav. Bank* v. *Shapiro,* 324 Mass. 678, 682 (discharge of quasi-surety by extension agreement); *Wheeler* v. *Menold,* 81 Iowa, 647, 648–649; annotation 76 A. L. R. 574, 586 (increase in secured indebtedness).

[6] Operating was to some extent given warning by this first mortgage of the possibility of an extension. This possibility was indicated by the special covenant (quoted fn. 2) numbered (7) by which the mortgagors were to remain liable notwithstanding any extension granted to a subsequent holder of the equity of redemption in the locus (or any other person), and even if, by transfer of the equity of redemption or otherwise (see *Brockton Sav. Bank* v. *Shapiro,* 311 Mass. 695, 702–703), the mortgagors should become essentially sureties. The related provision of the first mortgage note, if examined by Operating, would have given similar warning.

[7] The parties have stipulated that, under G. L. c. 168, § 36, par. 4, as amended, and c. 170, § 24, par. 8, as amended, some savings and coöperative banks "have, as a matter of regular business practice, agreed with owners of equities of redemption to change the amount of the periodic payments of principal and/or [*sic*] interest or other provisions called for by notes and mortgages held by them. In a majority of such cases this has been done without

We see no sound basis (see *Barbano* v. *Central-Hudson Steamboat Co.* 47 F. 2d 160, 163 [2d Cir.]) for any contention that execution of the proposed extension agreement would affect or diminish the priority of the bank's security interest as it existed at the time of the execution of the second mortgage, as against the holder of that mortgage.

3.   If the proposed extension agreement in fact should be executed, failure to make any of the postponed twenty-four monthly payments of principal would not constitute a default under the first mortgage.   The bank as first mortgagee would not be in a position to foreclose because of any failure of the mortgagors to make such payments on the date originally scheduled.   As was said in the *Commonwealth Life Ins. Co.* case, 234 Ky. 802, 809, "If the party to whom payment is due . . . agrees to a postponement of the date of payment, there is no default in any real sense of the word."   By the proposed extension agreement the time for the performance of "the [first mortgage] note . . . or any extension thereof" (see fn. 3, at points [A] and [B]) would be changed, so that there would be no breach of the statutory condition of the second mortgage with respect to payments of principal on the "prior" first mortgage, and also no failure to "perform the condition of" the first mortgage (see fn. 3, at point [C]) or "of any covenant contained in . . . any prior mortgage" (see fn. 3, at point [D]).

Part of the statutory condition found in the second mortgage, viz. that the mortgagors "shall perform the condition of any prior mortgage," of course, would afford Operating (as second mortgagee) opportunity to foreclose the second mortgage in the event of a breach of the first mortgage which would permit foreclosure of that mortgage by the bank as first mortgagee.   This part of the second mortgage condition is thus a protection to the second mortgagee against foreclosure of the prior mortgage which would de-

checking for the existence or seeking the assent of junior lienors on the mortgaged property."   This practice we regard as showing only that the statutory authorization of extension agreements by savings and coöperative banks may have met a significant commercial need.   See Meislin, Extension Agreements and the Rights of Junior Mortgagees, 42 Va. L. Rev. 939, 955–956.

Guleserian *v.* Fields.

stroy the interests of junior mortgagees and lienholders. Where, however, an extension agreement prevents a breach of the prior mortgage which could give rise to the foreclosure of that prior mortgage, there will be no breach of the junior mortgage which would afford basis for its foreclosure.[8]

Operating, perhaps, could have included in the second mortgage an express condition that the mortgagors must continue, without any extension or postponement, to make the instalment payments of principal on the first mortgage note. If such a provision had been made, postponement of any such payments by the proposed extension agreement would constitute, we assume, a breach of such a special condition of the second mortgage. In the circumstances outlined in the case stated, however, no breach of the statutory second mortgage condition will be caused by the proposed extension agreement.

4. A final decree is to be entered in the Superior Court making a declaration of the rights of the parties in a manner consistent with this opinion.

*So ordered.*

SPIEGEL, J. (concurring) I concur in the result reached by the opinion of the court but not on the basis of its reasoning.

In relation to the existing first mortgage note, the proposed postponement of principal payments for a two year period would cause the unpaid principal balance at any time thereafter to be larger than it would have been had the

---

[8] The facts of one decision are in many respects similar to those now before us, although the explicit subordinating language of the junior mortgage distinguishes it from the present case. *100 Eighth Ave. Corp.* v. *Morgenstern,* 3 Misc. 2d (N. Y.) 410, 414–416 (Supr. Ct. Spec. Term), affd. 4 App. Div. 2d (N. Y.) 754. There a ''modification agreement'' between a mortgagor and a first mortgagee reduced quarterly amortization payments (p. 413) and (unlike the situation in the present case) increased the rate of interest on unpaid principal balances. It was held (pp. 414–415) that payments by the mortgagor to the first mortgagee of the ''installments of principal and interest pursuant to the terms of the modification agreement'' did not constitute a breach of a second mortgage ''although such payments were different from the payments initially provided for in the original first mortgage.''

payments been made as scheduled and commensurately decreases the value of the security to Operating as the junior mortgagee. Thus, in the event of a default by the plaintiffs in their principal payments, Operating would be required to pay more than the amount it would otherwise pay in order to be subrogated to the rights of the bank as first mortgagee.

I agree that the mortgagors and the first mortgagee may make a binding agreement between themselves to alter the terms of the first mortgage. However, it is my belief that the requirement that the mortgagors "perform the condition of any prior mortgage" protects the second mortgagee from such an agreement. Hence, the second mortgagee is able to determine the full effect of the prior mortgage on its security by consulting the terms of the prior mortgage. If the previous mortgage expressly provides for a possible extension of time, the second mortgagee has notice of this and can adjust the terms of its agreement correspondingly.

I observe with special interest the following statement in the brief submitted on behalf of the Massachusetts Conveyancers Association and The Abstract Club as amici curiae: "These amici are satisfied that a sizeable segment of the conveyancing bar have heretofore proceeded upon the assumption that where a mortgagor failed to make payments as and when required by the first mortgage note as it stood at the date of the second mortgage, even with the concurrence of the first mortgagee, the second mortgagee could foreclose. Indulgences granted a mortgagor by the first mortgagee frequently work to the detriment of a second mortgagee, — depreciation on the building continues and may not be matched by reduced amortization payments, balloons sometimes are not paid and invariably affect refinancing. In view of such considerations it is arguable that as a matter of policy protection should be given to the second mortgagee, and the governing board of the Massachusetts Conveyancers Association has subscribed to that policy."

The case of *100 Eighth Ave. Corp.* v. *Morgenstern,* 3 Misc. 2d (N. Y.) 410, cited by the majority, is distinguishable on

its facts. In that case, the second mortgage expressly provided that it was subordinate to the first mortgage "and subordinate to any extensions thereof and to any mortgage or consolidated mortgage which may be placed on the premises in lieu thereof or to any extensions thereof provided in all such events (a) that the interest rate thereof shall not be greater than 4½% per annum and provided (b) the amortization shall be no different as presently is payable under the said mortgage."

I note that the Massachusetts Conveyancers Association and The Abstract Club in their brief concluded that "the proposed agreement with the Bank would constitute an extension contemplated by the language of the statutory condition." I do not agree. The statutory condition was enacted in its present form by St. 1913, c. 369, at a time when self-amortizing mortgages were rare.[1] I think it is a fair assumption that in 1913 the Legislature did not contemplate that some years in the future the self-amortizing mortgage would become commonplace. I believe that the extension contemplated by the statute was an extension of the date of maturity of the traditional mortgage in which the entire principal amount became due at maturity and not a fundamental change in the form of the mortgage from self-amortizing to traditional.

In the instant case, however, we are confronted with a somewhat unique situation. The mortgage contains a provision that the mortgagors agree "to remain liable upon the covenants herein and upon the note secured hereby notwithstanding *any forbearance, extension or other indulgence* given by the Holder to any future owner of the mortgaged premises or other person" (emphasis supplied). The mortgage also states that payment is to be made "as provided in our certain note of even date." The note provides that "All parties now or hereafter personally liable for the payment of any of the indebtedness hereby evi-

---

[1] See Meislin, Extension Agreements and the Rights of Junior Mortgagees, 42 Va. L. Rev. 939, which refers to "[t]he post-depression popularity of the fully self-amortizing mortgage."

denced agree, by executing or endorsing this note or by entering into or executing any agreement to pay any indebtedness hereby evidenced, that the owner or holder hereof shall have the right, without notice, . . . to grant to any party *any extensions of time for payment of any of said indebtedness or any other indulgences or forbearances whatsoever* without in any way affecting the personal liability of any party hereunder'' (emphasis supplied).

Because it is a condition of the prior mortgage that the time for ''payment of *any* of said indebtedness'' (emphasis supplied) may be extended, there can be no failure to ''perform the condition of any prior mortgage'' when payment is made according to the terms of the extension.